**Kathryn A. KIDWELL, Michael S. Coffman, Helen Eades, Ramona J. Ellis, Plaintiffs–Appellees,**

v.

**TRANSPORTATION COMMUNICA-TIONS INTERNATIONAL UNION; Transportation Communications International Union, ConRail System Board of Adjustment No. 86, Transportation Communications International Union, Seaboard System Board of Adjustment No. 3, Defendants–Appellants.**

**Kathryn A. KIDWELL, Michael S. Coffman, Helen Eades, Ramona J. Ellis, Plaintiffs–Appellants,**

v.

**TRANSPORTATION COMMUNICA-TIONS INTERNATIONAL UNION; Transportation Communications International Union, ConRail System Board of Adjustment No. 86, Transportation Communications International Union, Seaboard System Board of Adjustment No. 3, Defendants–Appellees.**

Nos. 90–2511, 90–2512.

United States Court of Appeals, Fourth Circuit.

Argued July 8, 1991.

Decided Oct. 3, 1991.

As Amended Oct. 28, 1991.

Laurence Gold, Washington, D.C., argued (Mitchell Kraus, Rockville, Md., James Coppess, Washington, D.C., Marshal S. Berzon, San Francisco, Cal., on brief), for defendants-appellants.

Milton Leroy Chappell, National Right to Work Legal Defense Foundation, Inc., Springfield, Va., argued, for appellees.

Before ERVIN, Chief Judge, and PHILLIPS and MURNAGHAN, Circuit Judges.

## OPINION

MURNAGHAN, Circuit Judge:

An employee who wishes to remain a union member but desires to contribute financially only to the aspects of union

activities related to collective bargaining sued the union whose rules prohibited such limited membership. Several nonmember employees also sued, claiming that the union was spending their mandatory payments on activities unrelated to collective bargaining. On cross motions for summary judgment, the district court judge granted summary judgment to the union member. He reasoned that forcing employees to choose between union membership, which provided possible participation in decisions relating to employment, and nonmembership, which required no financial responsibility for or contribution to the costs of the political and ideological activities of the union, violated statutory and first amendment rights. The judge denied the nonmember employees' motion for class certification and their specific objections on the merits or found them moot. Both parties appealed. We reverse the district court's conclusion as to the right of a union member in an agency shop to pay less than full dues but affirm its disposition of the remaining issues.

## I.

Four railroad employees sued the Transportation Communications International Union ("the union").[1] The union is the collective bargaining representative for the employees under the Railway Labor Act ("RLA"), 45 U.S.C. § 152. One of the plaintiffs, Kathryn A. Kidwell, is a member of the union. The other three plaintiffs, Michael S. Coffman, Helen Eades, and Ramona J. Ellis, are not.[2]

Union security provisions in the collective bargaining agreement require that all employees pay an agency fee, comprising the dues, initiation fees, and assessments of union members. As part of the agency shop relationship, the employees are required, as a condition of employment, to pay the agency fee to the union that is voted the collective bargaining representative; however, they are not required to

become union members. Agency shops differ from union shops in that regard because in a union shop, each employee technically becomes a union member. Because of a line of Supreme Court decisions discussed below, the union voted collective bargaining representative in an agency shop may arrange to collect the costs of collective bargaining from all employees, but may not compel objecting nonmember employees to pay for union activities other than those related to collective bargaining. The union thus must have an objection procedure with respect to noncollective bargaining activities available to nonmembers.

For example, under the union's current procedure, in each calendar year, for thirty days after receiving an April notice, nonmember employees may object to the expenditure of their fees on activities unrelated to collective bargaining. An objector's agency fee then will be reduced by a set percentage. The union has an independent legal expert decide which activities are chargeable and which are not, and a certified public accountant prepares the accompanying accounting materials. The union's newspaper publishes the breakdown between chargeable and nonchargeable expenses. An objector who disagrees with the amount of fee reduction may challenge it before a neutral arbitrator. The union holds all of the objector's fee payment in an interest-bearing escrow account pending the decision. The union pays all costs of the arbitration.

The plaintiffs' initial complaint requested declaratory, monetary and injunctive relief on the grounds that the union's method for collecting and reducing dues for members and nonmembers lacked procedural safeguards and that the amount of required fees exceeded that constitutionally and statutorily permitted. In particular, the plaintiffs alleged violations of the First Amendment and § 2, Eleventh of the RLA. When the suit was first filed, the union permitted both union member and nonmember employees to object to the payment of

---

1. Formerly the Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees ("BRAC").

2. Initially, two of the four plaintiffs were members of the union. One of them, Eades, subsequently resigned when she retired.

fees not germane to collective bargaining activities. The union apparently allowed objections by members to reduce the incentive to resign. In May 1988, however, the union changed its policies so that only nonmembers could object. The union offers two reasons for the change. First, the union argues that the change responded to the increased burden of processing each objection under procedures established in *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986). Second, the union alleges that losers in union elections were urging their supporters to object as a protest over the outcome of the election.

On cross motions for summary judgment, the district judge held that the union had to permit objecting union members to pay reduced dues.[3] The judge also held that the union's procedure for handling objections was permissible and refused to determine the actual amount of fees payable by objectors. He denied class certification of all past and future objectors; however, he certified the limited class of union members who either were not told of an opportunity to object or objected and were denied a reduction.

In the first part of the district court judge's opinion, he read *Railway Employees' Dep't v. Hanson*, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956) and *International Ass'n of Machinists v. Street*, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961) to hold that the RLA did not authorize unions to spend money on political causes over the objection of employees. He then read later cases—*Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) and *Ellis v. Railway Clerks*, 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984)—to conclude that the prohibition against these union expenditures also arose from the First Amend-

ment. The judge emphasized that, if Kidwell were a nonmember of the union, she

can no longer vote on the representatives who are given the exclusive right to negotiate her terms of employment; she can no longer participate in the resolution of disputes over conditions of employment; and perhaps most significantly, she cannot vote on the terms and conditions of employment that the Union representatives negotiate and to which she will be subjected.... In short, at the risk of stating the choice too simplistically, she is given the option of protecting free speech or of protecting her vote on the continuation or conditions of work, but not both.

He noted that certain infringements on the First Amendment were bound up with the concept of collective bargaining. "When the union, however, strays from that charter given by the Railway Labor Act ... and uses dues to support candidates, religious beliefs, or any other ideological cause, it is not an answer to say to one who is opposed to those views, 'leave the union.'" He concluded that "in the context of governmental action that is imposed by the Railway Labor Act, the restriction on First Amendment freedoms must be drawn as narrowly as is consistent with the Congressional purpose in enacting the Railway Labor Act." Thus the judge found that Kidwell, though a union member, was entitled to a "reduction [in her union dues] attributable to all union expenses unrelated to collective bargaining."[4]

In the second part of his opinion, the district court judge noted that since the case was filed, the Supreme Court had decided *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986). He explained that the union had changed its procedures but that the plaintiffs challenged the pre-*Hudson* procedures

---

**3.** The part of the decision requiring the union to permit union members to object has apparently been stayed by another district court pending appeal.

**4.** The judge issued a later memorandum and order distinguishing *Steele v. Louisville & Nashville R.R. Co.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), *Minnesota State Bd. for Com-*

*munity Colleges v. Knight*, 465 U.S. 271, 104 S.Ct. 1058, 79 L.Ed.2d 299 (1984), and *United Steelworkers v. Sadlowski*, 457 U.S. 102, 102 S.Ct. 2339, 72 L.Ed.2d 707 (1982). He found *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), compatible with his conclusion.

as well as the newer ones. He concluded that *Hudson* could be retroactively applied to pre–1986 policies and examined the specific contentions. The only aspects that are raised on appeal involve particular objections from which the district court judge refrained because he concluded the arbitral process was the more proper avenue. The plaintiffs also have not appealed from the judge's conclusion that the procedures did not violate the union's duty of fair representation. The judge denied all damages, including the request for nominal $1.00 damages. And he denied a motion to amend the judgment to certify a class of all objectors, although he certified a smaller class relating to Kidwell's argument that members have a right to object.

Both sides appeal. The union contends that its requirement that employees either be members and, therefore, pay full dues, or be nonmembers with the right to object and seek reduction of noncollective bargaining expenditures, does not violate the Constitution or the RLA. Kidwell asserts that she has a constitutional and statutory right to be a union member and not pay costs unassociated with collective bargaining activities. The nonmember employees appeal from several of the district court's conclusions respecting the objection procedures and the denial of class certification.

## II.

We recognize that the position urged by Kidwell and adopted by the district judge is not without its appeal. Why should an employee be forced to choose between nonmembership with the right to object or membership at the cost of supporting all the union's activities, including those with which the employee may disagree for political or ideological reasons? Kidwell argues

that without union membership, she cannot participate in certain union activities that have a bearing on the conditions of her employment, for example, ratification of a collective bargaining agreement or election of individuals to represent the union in collective bargaining. Aware that the Supreme Court has never confronted or answered the question Kidwell and the union pose, we have scrutinized the arguments presented by the parties. We conclude, however, that neither the RLA nor the First Amendment confers on a union member employee the right to associate as a member with the union serving as the collective bargaining representative yet pay only for the costs of union activities related to collective bargaining.[5] After summarizing the legislative and jurisprudential background to the issue, we consider Kidwell's contention first under the RLA and then under the First Amendment.

### A. The RLA, Collective Bargaining, and the Right to Object

"The labor relations of interstate carriers have been a subject of congressional enactments since 1888." *International Ass'n of Machinists v. Street,* 367 U.S. 740, 755–56, 81 S.Ct. 1784, 1793, 6 L.Ed.2d 1141 (1961). Since the Railway Labor Act of 1926, "Congress has ... consistently adhered to a regulatory policy which places the responsibility squarely upon the carriers and the unions mutually to work out settlements of all aspects of the labor relationship." *Id.* at 757, 81 S.Ct. at 1794. In 1934, Congress revised the 1926 Act to strengthen the unions and lessen the possibility of interference from employers, *e.g.,* company unions. *Id.* at 759, 81 S.Ct. at 1795. Of importance to the question before us was the decision to empower an exclusive bargaining repre-

5. For the purposes of this opinion, we assume but do not decide, that if Kidwell has a right to membership in the union with a right to object, she may enjoy all the benefits of membership. We note, however, that we would not reach a different result were we to consider a "limited membership," *e.g.,* a membership in which one could participate only in the activities to which one contributed. However, we believe that cases decided under the RLA and the First Amendment establish only two kinds of union

activities: 1) those related to collective bargaining activities; 2) those not related to collective bargaining activities, a.k.a. political or ideological activities. *See Communications Workers v. Beck,* 487 U.S. 735, 761, 108 S.Ct. 2641, 2656, 101 L.Ed.2d 634 (1988); *Ellis,* 466 U.S. at 447, 104 S.Ct. at 1891; *Abood,* 431 U.S. at 236, 97 S.Ct. at 1800; *Street,* 367 U.S. at 770, 81 S.Ct. at 1800; *Hanson,* 351 U.S. at 238, 76 S.Ct. at 721. We do not perceive the existence of any third category and none has been here alleged.

sentative elected by a majority of *all employees:*

> It was made explicit that the representative selected by a majority of any class or craft of employees should be the exclusive bargaining representative of all the employees of that craft or class. "The minority members of a craft are thus deprived by the statute of the right, which they would otherwise possess, to choose a representative of their own, and its members cannot bargain individually on behalf of themselves as to matters which are properly the subject of collective bargaining." "Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents...."

*Id.* at 759–60, 81 S.Ct. at 1795 (citations omitted). Thus, the Act's creation of an exclusive bargaining representative gave "the unions a clearly defined and delineated role to play in effectuating the basic congressional policy of stabilizing labor relations...." *Id.* at 760, 81 S.Ct. at 1795. The exclusive bargaining representative system continues to the present; however, three subsequent decisions by Congress and the Supreme Court frame the present problem: the interpretation of the duty of fair representation in the RLA; the passage of § 2, Eleventh to the RLA; and the creation of a right to object in the RLA.

At the time of the 1934 revisions, Congress considered the issue of union security provisions. A security provision usually provides that, as a condition of employment, an employee must join the union. Unlike other industries, only one union in the railway industry had security provisions in a contract. *Id.* at 751, 81 S.Ct. at 1790. Although in 1934 the railway unions attempted to obtain legislation permitting security provisions, the final bill provided that "[n]o carrier ... shall require any person seeking employment to sign any contract or agreement promising to join or not to join a labor organization." *Id.* at 753, 81 S.Ct. at 1792. The unions raised the issue again during World War II but a presidential Emergency Board rejected the provision. *Id.*

In 1950, Congress reevaluated the union security question "primarily in terms of its relationship to the financing of the unions' participation in the machinery created by the Railway Labor Act to achieve its goals." *Id.* at 755, 81 S.Ct. at 1793. The emerging concern involved the realization that the union's performance of collective bargaining functions entailed "the expenditure of considerable funds." *Id.* at 760, 81 S.Ct. at 1796. Expenditure of funds had gained significance after the Supreme Court's decision in *Steele v. Louisville & Nashville R.R. Co.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), which ensured that the union's expenditure of funds for collective bargaining had to be spent equally on nonunion members.

In *Steele*, the union had excluded from membership, "by the constitution and ritual of the Brotherhood," black railroad workers. *Id.* at 194, 65 S.Ct. at 228. The union, "purporting to act as representative of the entire craft of firemen," *id.* at 195, 65 S.Ct. at 228, but "without informing the Negro firemen or giving them opportunity to be heard," *id.*, then negotiated to restrict, and ultimately end, the employment of black firemen. The Court held that the union's practice violated its statutory duties. The Court explained that, under the RLA, "[t]he labor organization chosen to be the representative of the craft or class of employees is thus chosen to represent all of its members, regardless of their union affiliations or want of them." *Id.* at 200, 65 S.Ct. at 231. Basing the decision on the nature of a democratic system, the Court declared:

> Unless the labor union representing a craft owes some duty to represent nonunion members of the craft ... the minority would be left with no means of protecting their interests or indeed their right to earn a livelihood by pursuing the occupation in which they are employed.... It is a principle of general application that the exercise of a granted power to act in behalf of others involves the assumption toward them of a duty to exercise the power in their interest and

behalf, and that such a grant of power will not be deemed to dispense with all duty toward those for whom it is exercised unless so expressed.

We think that the Railway Labor Act imposes upon the statutory representative of a craft at least as exacting a duty to protect equally the interests of the members of the craft as the Constitution imposes upon a legislature to give equal protection to the interests of those for whom it legislates. Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represented, ... but it has also imposed on the representative a corresponding duty.

*Id.* at 201–02, 65 S.Ct. at 231–32.

After *Steele*, "[u]nder the statutory scheme, a union's status as exclusive bargaining representative carries with it the duty fairly and equitably to represent all employees of the craft or class, union or nonunion." *Street*, 367 U.S. at 761, 81 S.Ct. at 1796. Thus, in the 1950s, the unions, now with the unquestionable duty of equal and fair representation of all employees regardless of union membership, argued that if they had to represent all employees, it was only fair to spread the costs among all employees. As one spokesman for the unions stated, " 'We believe that it is essentially unfair for nonmembers to participate in the benefits of those activities without contributing anything to the cost.' " *Id.* (citation omitted).

Eventually, Congress decided that it might be unfair to permit " '[n]onunion members ... [to] share in the benefits derived from collective agreements negotiated by the railway labor unions but [to] bear no share of the cost of obtaining such benefits.' " *Id.* at 762, 81 S.Ct. at 1796 (*quoting* H.R.Rep. No. 2811, 81st Cong., 2d Sess., at 4). An amendment to the RLA passed as "[t]hese considerations overbore the arguments in favor of the earlier policy of complete individual freedom of choice." *Id.* at 763, 81 S.Ct. at 1797. The amendment, § 2, Eleventh provided:

Eleventh. Union security agreements; check-off

Notwithstanding any other provisions of this chapter, or of any other statute or law of the United States, or Territory thereof, or of any State, any carrier or carriers as defined in this chapter and a labor organization or labor organizations duly designated and authorized to represent employees in accordance with the requirements of this chapter shall be permitted—

(a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class: *Provided,* That no such agreement shall require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member or with respect to employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership.

(b) to make agreements providing for the deduction by such carrier or carriers from the wages of its or their employees in a craft or class and payment to the labor organization representing the craft or class of such employees, of any periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership: *Provided,* That no such agreement shall be effective with respect to any individual employee until he shall have furnished the employer with a written assignment to the labor organization of such membership dues, initiation fees, and assessments, which shall be revocable in writing after the

expiration of one year or upon the termination date of the applicable collective agreement, whichever occurs sooner.

45 U.S.C. § 152, Eleventh (subsections (c) and (d) omitted). Thus with the passage of § 2, Eleventh, two major components of the RLA were in place. And with the provision's passage came the judicial interpretation of it, and later, a parallel provision in the National Labor Relations Act ("NLRA"), § 8(a)(3), to create the right to object.

After § 2, Eleventh's passage, the unions, under their interpretation of the section, negotiated union security provisions and began to charge all employees—members and nonmembers—equal dues. The constitutionality of § 2, Eleventh was almost immediately challenged. But, in *Railway Employees' Dep't v. Hanson*, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956), the Court held that "the requirement for financial support of the collective bargaining agency," under § 2, Eleventh did not violate the First or Fifth Amendments. *Id.* at 238, 76 S.Ct. at 721.

In 1961, a new challenge appeared, brought by employees who did not want their compelled contribution to go to the union's traditional involvement in political activities. The Court answered this question against the background of § 2, Eleventh's origins:

The history of union security in the railway industry is marked *first,* by a strong and long-standing tradition of voluntary unionism on the part of the standard rail unions; *second,* by the declaration in 1934 of a congressional policy of complete freedom of choice of employees to join or not to join a union; *third,* by the modification of the firm legislative policy against compulsion, but only as a specific

response to the recognition of the expenses and burdens incurred by the unions in the administration of the complex scheme under the Railway Labor Act. *Street,* 367 U.S. at 750–51, 81 S.Ct. at 1790–91. The *Street* Court concluded that "Congress did not completely abandon the policy of full freedom of choice embodied in the 1934 Act, but rather made inroads on it for the limited purpose of eliminating the problems created by the 'free rider.'" *Id.* at 767, 81 S.Ct. at 1799. And thus, the Court construed § 2, Eleventh to "deny the unions, over an employee's objection, the power to use his exacted funds to support political causes which he opposes." *Id.* at 768–69, 81 S.Ct. at 1800.

*Hanson* and *Street* had involved private employees, union shops, and the RLA. *NLRB v. General Motors Corp.,* 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963), raised the legitimacy of the agency shop. General Motors argued that § 8(a)(3) of the NLRA only discussed "membership" and the agency shop, which did not require actual membership, therefore, was not permitted.[6] The agency shop would not entitle employees "to attend union meetings, vote upon ratification of agreements negotiated by the union, or have a voice in the internal affairs of the union." *Id.* at 737, 83 S.Ct. at 1456. The Court concluded that agency shops were acceptable, explaining that "membership" as used in the section "as a condition of employment is whittled down to its financial core." *Id.* at 742, 83 S.Ct. at 1459.[7] The Court noted, "Also wide of the mark is respondent's further suggestion that Congress contemplated the obligation to pay fees and dues to be imposed only in connection with actual membership in the union, so as to insure the enjoyment of all union benefits and rights by those from whom money is extracted." *Id.* at 744 n.

---

**6.** Section 8(a)(3) is "in all material respects identical" to § 2, Eleventh. *Communications Workers v. Beck,* 487 U.S. 735, 745, 108 S.Ct. 2641, 2648, 101 L.Ed.2d 634 (1988).

**7.** The Court pointed out that even in a union-shop, if an employee failed to act in accordance with any union obligations other than the mini-

mum dues payment, the union could terminate "formal" membership, but the employee would remain a "member" for the purposes of § 8(a)(3). The Court added that Congress only purpose in permitting union security agreements was to solve the free rider problem. 373 U.S. at 742–43, 83 S.Ct. at 1459.

12, 83 S.Ct. at 1460.[8]

The Court applied *General Motors* to the RLA and, in *Ellis v. Railway Clerks*, 466 U.S. 435, 452 n. 13, 104 S.Ct. 1883, 1894 n. 13, 80 L.Ed.2d 428 (1984), found § 2, Eleventh to authorize negotiation of an agency shop. Agency shops were once again addressed in *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), this time in the context of public-sector employee unions in a non-RLA case. The Court held that an agency shop clause in a collective bargaining agreement covering governmental employees was constitutionally valid but that the union could not use money from objecting employees to support ideological or political activities not related to duties as collective bargaining representative. *Id.* at 235–36, 97 S.Ct. at 1799–1800. Recently, in *Communications Workers v. Beck*, 487 U.S. 735, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988), the Court concluded that a union under the NLRA § 8(a)(3) also could not use money collected from objecting nonmember employees for activities unrelated to collective bargaining.

 The cases have answered a number of questions. The RLA is constitutional and permits agency shops. The RLA requires that the union as collective bargaining representative fairly represent all employees but that, in exchange, the union may collect money from all employees to cover these expenses. And, under the RLA, nonmember objecting employees can only be compelled to pay for activities germane to collective bargaining. In none of these cases, however, was the Court asked to decide whether an employee had a right to be a member of the union chosen as the collective bargaining agent while paying only the costs associated with collective bargaining activities.

Kidwell argues vigorously that the prior decisions of the Court use language indicating that all employees, including union members, may object and thus they compel the result here. We disagree. In not one of the cases did the Court hold the union

members employed in an agency shop had a right to object.

The confusion arises because the early cases—*Hanson* and *Street*—involved union-shop provisions. In a union shop, because every employee is technically a union member, the cases did not distinguish between union members and nonmembers. Nevertheless, the Court, even when referring to union shops, recognized that the membership of an objecting employee, albeit technically a union member, differed from the union membership held by employees who wanted to be union members. For example, in *Railway Clerks v. Allen*, 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963), the Court noted that "[a]lthough the Agreement requires employees to become union members within the 60–day period, in fact petitioners do not insist that employees actually join the union, but regard payment of the uniform exactions required by the Agreement as complete compliance therewith." *Id.* at 116 n. 2, 83 S.Ct. at 1161 n. 2. *See General Motors*, 373 U.S. at 742, 83 S.Ct. at 1459 ("membership" "as a condition of employment is whittled down to its financial core"); *Pattern Makers' League v. NLRB*, 473 U.S. 95, 106 n. 16, 105 S.Ct. 3064, 3071 n. 16, 87 L.Ed.2d 68 (1985) ("[A]n employee required by a union security agreement to assume financial 'membership' ... [is] a 'member' of the union only in the most limited sense").

Even when actual agency shops began to be addressed, the Court continued to perceive a distinction. For example, the *Abood* Court concerned itself with reversing the ruling of the Michigan Court of Appeals that "state law 'sanctions the use of nonunion members' fees for purposes other than collective bargaining.'" 431 U.S. at 232, 97 S.Ct. at 1798 (*quoting Abood v. Detroit Bd. of Ed.*, 60 Mich.App. 92, 230 N.W.2d 322, 326 (1975)). Thus, although language used by the Court could be perceived differently without regard to the facts of the case, the issue addressed was only whether the Michigan law that

---

**8.** This statement would seem to rebut Kidwell's claim; however, the Court noted that "the significance of desired, but unavailable, union membership, or the benefits of union membership ... we leave for another case." *Id.* at 745 n. 12, 83 S.Ct. at 1460 n. 12.

required *nonmembers* to pay agency fees used for non-collective bargaining purposes was permissible. Indeed, in *Abood,* the Supreme Court implied that it was "the *additional requirement* of a union-shop arrangement that each employee formally join the union" that might not be constitutionally permissible. *Id.,* 431 U.S. at 217 n. 10, 97 S.Ct. at 1791 (emphasis added).

Similarly, in *Ellis v. Railway Clerks,* 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984) the Court perceived a difference between "voluntary members" and "those whose membership is forced upon them." *Id.* at 445, 104 S.Ct. at 1891. Moreover, the Court repeatedly referred to "nonmembers" as the objecting employees. For example, the Court wrote that "it would be perverse to read it [§ 2, Eleventh] as allowing the union to charge to objecting nonmembers part of the costs of attempting to convince them to become members." *Id.* at 452 n. 13, 104 S.Ct. at 1894 n. 13. Similarly, the Court stated that "[w]e would have no hesitation in holding ... that the union lacks authorization under the RLA to use nonmembers' fees for death benefits they cannot receive." *Id.* at 455 n. 14, 104 S.Ct. at 1896 n. 14. And, the Court permitted expenditures for social activities after noting that these "activities are formally open to nonmember employees." *Id.* at 449, 104 S.Ct. at 1893.

The most recent cases to be decided, perhaps recognizing the issue that Kidwell raises, carefully distinguish between union member and nonmember employees. For example, in *Beck,* the Court wrote "that § 2, Eleventh of the RLA does not permit a union, over the objections of nonmembers, to expend compelled agency fees on political causes." 487 U.S. at 745, 108 S.Ct. at 2648; *see id.* at 752, 758, 759, 760, 761, 108 S.Ct. at 2651, 2655, 2655, 2656, 2656. We have followed the approach in *Dashiell v. Montgomery Co., Md.,* 925 F.2d 750, 754 (4th Cir.1991) ("The First Amendment will not tolerate a compulsory subsidization, even if only temporarily, by nonunion employees of fees used for union activities unrelated to collective bargaining.").

After having examined these cases, we believe that, as a semantic matter, the early cases based the right to object on compelled membership and the most recent cases extend the right to object in an agency shop only to nonmembers. Thus, we suspect that to the degree the Court can be said to have addressed the matter, its precedent goes against Kidwell. However, we conclude that the issue has not been directly addressed, *i.e.,* conclusively decided, and so we move beyond semantics.

**B.** *The Right to Object under the RLA*

In the agency shop context, the RLA, and the judicial interpretation of it, extend the right to object only to nonmember employees. The Court found the right to object for involuntary members of union shops by construing the RLA to authorize unions to compel fees only for the duties placed upon them by the RLA, namely, collective bargaining activities. In the absence of § 2, Eleventh, the unions could not have obtained any money from employees who chose not to be members of the union, *Street,* 367 U.S. at 762, 770, 81 S.Ct. at 1796, 1800, therefore the unions could only use this "coerced" money for the limited purpose for which § 2, Eleventh was enacted—to solve the "free rider" problem by sharing "the costs of negotiating and administering collective agreements, and the costs of the adjustment and settlement of disputes." *Id.* at 764, 81 S.Ct. at 1797. The rationale, elucidated in *Street,* struck a balance. If coerced employees had to pay for the union's political activities, it would mean "that Congress sanctioned an expansion of historical practices in the political area by the rail unions." *Id.* at 770, 81 S.Ct. at 1800. The Court refused to allow unions greater power to collect money but also declined to curtail "the traditional political activities of the railroad unions." *Id.* The *Street* Court held that its holding meant "only that those unions must not support those activities, against the expressed wishes of a dissenting employee, with his exacted money." *Id.*

The reasoning behind *Street* goes far to dissolve Kidwell's argument. Where the employee has a choice of union membership

and the employee chooses to join, the union membership money is not coerced. The employee is a union member voluntarily. Moreover, to find that the union may not collect money for political activities from its members would curtail the political activities traditionally funded by voluntary union membership prior to the enactment of the RLA. *Id.* at 750–51, 770, 81 S.Ct. at 1790–91, 1800.

The *Street* rationale remains valid. Even after *Abood* with its First Amendment analysis,[9] the Court returned in *Ellis* to base the right for nonmembers to object in the RLA. The Court echoed *Street:* "Congress' essential justification for authorizing the union shop was the desire to eliminate free riders—employees in the bargaining unit on whose behalf the union was obliged to perform its statutory functions, but who refused to contribute to the cost thereof." 466 U.S. at 447, 104 S.Ct. at 1892. The *Ellis* Court emphasized that because "[o]nly a union that is certified as the exclusive bargaining agent ...," *id.* at 447–48, 104 S.Ct. at 1892, could collect fees, "[u]ntil such a contract is executed, no dues and fees may be collected from objecting employees who are not members of the union...." *Id.* at 448, 104 S.Ct. at 1892. Thus, once again the Court reasoned that the union's right to collect money from

objecting nonmembers arose only because of the RLA, and therefore the RLA limited an objecting nonmember employee's burden under § 2, Eleventh to expenditures "necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues." *Id.*

That the right to object is intended to benefit *only* nonmembers-those employees who, in the absence of the collective bargaining arrangements, would prefer not to be involved at all with the union-is demonstrated by *Beck,* decided under the parallel provision in the NLRA, § 8(a)(3). In *Beck,* 487 U.S. 735, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988), the Court found the political objection limitation of the RLA present in the NLRA.[10] The Court read *Street* to hold that "§ 2, Eleventh of the RLA does not permit a union, over the objections of *nonmembers,* to expend compelled agency fees on political causes." 487 U.S. at 745, 108 S.Ct. at 2648 (emphasis added). It read *Ellis* to hold that " 'Congress' essential justification for authorizing the union shop' limits the expenditures that may properly be charged to *nonmembers* under § 2, Eleventh to those 'necessarily or reasonably incurred for the purpose of performing the duties of an exclusive [bargaining] representative.' " *Id.* at 752, 108 S.Ct. at

9. The objection right in *Abood,* of course, had to be based on the First Amendment because at issue was a Michigan state law similar to § 2, Eleventh. The Michigan courts had construed the law to permit unions to use nonmember fees for purposes other than collective bargaining. 431 U.S. at 232, 97 S.Ct. at 1798.

10. Three justices—Justices Blackmun, O'Connor, and Scalia—concurred and dissented. They argued that Congress had not intended in enacting § 8(a)(3) "to limit either the amount of 'agency fees' ... a union may collect under a union-security agreement, or the union's expenditure of such funds." 487 U.S. at 763, 108 S.Ct. at 2658. They noted that "the legislative history indicates that Congress affirmatively declined to place limitations on either the amount of dues a union could charge or the uses to which it could put these dues." *Id.* at 773, 108 S.Ct. at 2662. The dissent argued that a fundamental difference existed between the RLA and the NLRA: unlike the NLRA, the RLA was based on a tradition without union security agreements and Congress had entered the field only to permit the collection of fees from all

employees to solve the free rider problem. According to the dissent, the RLA had to be narrowly construed because Congress was extending authority to unions where none had existed; however, with the NLRA, Congress was attempting to "limit only the most serious abuses of compulsory unionism." *Id.* at 775, 108 S.Ct. at 2664.

We doubt that the three justices, willing to require all employees under the NLRA to pay for all union activities, would accept that the RLA not only permits nonmembers to object, but requires the union to allow its own members to object. Indeed, like the majority, the three Justices assumed that full "membership" in the union was not contemplated by the RLA and the NLRA. They explained that " 'membership' as used ... means not *actual* membership in the union but rather 'the payment of initiation fees and monthly dues.' " *Id.* at 765 n. 4, 108 S.Ct. at 2659 n. 4 (*quoting General Motors,* 373 U.S. at 742, 83 S.Ct. at 1459 (emphasis in original)).

2652 (emphasis added) (*quoting Ellis*, 466 U.S. at 447–48, 104 S.Ct. at 1892).

Moreover, the Court repeatedly suggested that § 8(a)(3) was concerned with "the rights of *nonmembers* who are compelled to pay union dues...." *Id.*, 487 U.S. at 758, 108 S.Ct. at 2655 (emphasis in original). For example, the petitioners had argued that Congress' rejection of a House bill that suggested regulation of union finances was significant in interpreting § 8(a)(3). The Court distinguished the bill by explaining that it had "sought to establish a 'bill of rights for union *members'* vis-a-vis their union leaders," and addressed "internal union affairs" rather than the "rights of nonmembers." *Id.* at 758, 108 S.Ct. at 2655 (emphasis in original). The Court added, "Congress understood § 8(a)(3) to afford nonmembers adequate protection by authorizing the collection of only those fees necessary to finance collective-bargaining activities...." *Id.* at 759, 108 S.Ct. at 2655. And it concluded that "Congress understood § 8(a)(3) simply to enable unions to charge nonmembers only for those activities that actually benefit them." *Id.* at 760, 108 S.Ct. at 2656.[11]

Although *Beck* was decided under the NLRA, the Court relied heavily on the RLA and cases construing it. *Id.* at 745–46, 750–56, 761–62, 108 S.Ct. at 2648–49, 2650–54, 2656–57. Indeed, the Court stated that § 8(a)(3) of the NLRA and § 2, Eleventh of the RLA had "parallel purpose[s], structure, and language" and should be interpreted "in the same manner." *Id.* at 752, 108 S.Ct. at 2652. We thus find highly persuasive *Beck*'s extension only to nonmembers of the right to object.

Although the compelled nature of nonmember contributions justifies limiting them to the collective bargaining activities contemplated by the RLA, nothing in the RLA supports such a limit on contributions by voluntary union members. Of course, members' contributions are statutorily lim-

ited in the federal election area. One section of the laws governing federal election campaigns requires contributions or expenditures from unions to federal elections to be voluntarily obtained from informed union members. 2 U.S.C. § 441b; *see Pipefitters v. United States*, 407 U.S. 385, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972); *American Fed. of Labor & Cong. of Ind. Orgs. (AFL–CIO) v. Federal Election Comm'n*, 628 F.2d 97 (D.C.Cir.), *cert. denied*, 449 U.S. 982, 101 S.Ct. 397, 66 L.Ed.2d 244 (1980). But that limitation appears to be the only one on members' contributions to the union for political activities. Congress was "fully conversant with the long history of intensive involvement of the railroad unions in political activities." *Street*, 367 U.S. at 767, 81 S.Ct. at 1799. "Congress was well aware of the broad scope of traditional union activities," *Ellis*, 466 U.S. at 446, 104 S.Ct. at 1891, and "that unions had historically expended funds in the support of political candidates and issues." *Id.* at 447, 104 S.Ct. at 1891. In light of this knowledge, the absence of further explicit restrictions on membership fees is notable. *See Beck*, 487 U.S. at 756–61, 108 S.Ct. at 2654–56.

Kidwell, however, argues the enactment of the RLA gave the union power over the conditions of her employment and so her decision about union membership can no longer be understood as truly voluntary. According to the district judge, without union membership, as merely an agency shop member, she has to give up the following rights or privileges:

1. Voting on "the representatives who are given the exclusive right to negotiate her terms of employment."

2. Voting "on the terms and conditions of employment that the Union representatives negotiate and to which she will be subjected."

3. Participating in "the resolution of disputes over conditions of employment."

---

11. Kidwell calls our attention to footnote 8 of the opinion and the sentence that states: "the uniformity requirement inures to the benefit of dissident union members as well, by ensuring that if the union discriminates against them by charging higher dues, their failure to pay such

dues cannot be ground for discharge." 487 U.S. at 753 n. 8, 108 S.Ct. at 2653 n. 8. We have concluded that the aim was to emphasize that the union cannot apportion the costs of collective bargaining unevenly even among members.

Although we understand Kidwell's desire to participate in those activities, the RLA does not contemplate the direct employee participation that Kidwell claims. Moreover, the RLA assures that all employees, regardless of union membership, obtain the same benefits.

The first privilege, the right to vote on collective bargaining representatives, Kidwell cannot actually even relinquish. The RLA guarantees to each employee the right to vote on the exclusive collective bargaining representative. Section 2, Second, Third, Fourth, and Ninth state that *"employees"* vote on the collective bargaining representative. 45 U.S.C. § 152. The Court has explained the role of the bargaining representative under parallel provisions in the NLRA:

> [The NLRB] exemplifies the faith of Congress in free collective bargaining between employers and their employees when conducted by freely and fairly chosen representatives of appropriate units of employees.... Any authority to negotiate derives its principal strength from a delegation to the negotiators of a discretion to make such concessions and accept such advantages as, in the light of all relevant considerations, they believe will best serve the interests of the parties represented.... A bargaining representative ... often is a labor organization but it is not essential that it be such. The employees represented often are members of the labor organization which represents them at the bargaining table, but it is not essential that they be such. The bargaining representative, whoever it may be, is responsible to, and owes complete loyalty to, the interests of all whom it represents.

*Ford Motor Co. v. Huffman,* 345 U.S. 330, 337–38, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953). "If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized," the Mediation Board must investigate and certify "the name or names of the individuals or organizations that have been designated...." Section 2, Ninth. To carry out this duty, the Board can require a secret poll of all employees.

Thus all employees vote on the individual or organization designated the collective bargaining representative.

Apparently what Kidwell dislikes is that, in the present case, the employees vote to designate the union and then the union votes on a particular individual or individuals to represent the union. If Kidwell is not a union member, then admittedly she has no vote on the union's internal delegation. But Kidwell's inability to vote on the internal delegation if she relinquishes union membership does not deprive her of her initial vote. The process appears to be an acceptable and expected delegation of authority from all employees to the union and then to a smaller decision-making group within the union. If Kidwell objects to the designation of the union in the first place, she has remedies. She can convince a majority of her coworkers to vote only for specific individuals rather than the union or for some other union or association.

The second privilege, ratification of the terms and conditions of employment negotiated, follows from the internal union delegation. When a union votes to choose an individual or individuals to negotiate the terms and conditions of employment, union ratification of the negotiated agreement appears to be a proper method of delegating and reconfirming the union's authority. The process of delegation and ratification has long been held in this country to be an appropriate process when one wants to assure that the body politic has approved the issue. U.S. Const. art. V. The best way for the "union" to fulfill its responsibility as collective bargaining representative may be by delegation and ratification. Once again, if Kidwell dislikes choosing an entire union as the bargaining representative and the union's subsequent internal delegation and ratification, she can convince the majority of employees to select an individual or an independent group as the collective bargaining representative.

In fact, the Court has rejected a similar argument about ratification under the NLRA when made by a company. In *NLRB v. Wooster Div. of Borg–Warner Corp.,* 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d

823 (1958), the Court held that an employer could not require that the union as the collective bargaining representative agree to a "ballot clause" under which *all employees,* union and nonunion, would vote by secret ballot on the acceptance of the company's final offer. *Id.* at 343–44, 78 S.Ct. at 720. The Court explained,

> "The 'ballot' clause ... deals only with relations between the employees and their unions. It substantially modifies the collective bargaining system provided for in the statute by weakening the independence of the 'representative' chosen by the employees. It enables the employer, in effect, to deal with its employees rather than with their statutory representative."

*Id.* at 350, 78 S.Ct. at 723. The reasoning of *Wooster* would seem equally to apply to a case brought by an employee under the RLA.

■ The third privilege Kidwell claims, participation in the resolution of disputes, is delegated to the exclusive bargaining representative as an inherent part of the RLA scheme. Once the employees have voted on a collective bargaining representative, that representative has a duty fairly to represent all employees. *See Steele,* 323 U.S. at 201–02, 65 S.Ct. at 231. That representative, bound by the duty of fair representation, has broad authority under the RLA. *Id.* The second provision of the RLA states that "[a]ll disputes between a carrier ... and its ... employees shall be considered, and if possible, decided, with all expedition, in conference between representatives designated and authorized so to confer...." 45 U.S.C. § 152, Second. Similarly, the sixth provision states that disputes arising out of grievances or the interpretation of agreements are to be decided between "the designated representative ... of such employees" and the carrier. *Id.,* Sixth. The entire plan of the RLA is to reduce labor problems by requiring a single representative of the employees and the carrier to settle issues. *Street,* 367 U.S. at 760, 81 S.Ct. at 1795; *Hanson,* 351 U.S. at 233–34, 76 S.Ct. at 718–19. Thus, the NLRA and the RLA "give[ ] a bargaining representative not only wide responsibility but authority to meet that responsibility." *Huffman,* 345 U.S. at 339, 73 S.Ct. at 686–87; *see Steele,* 323 U.S. at 202, 65 S.Ct. at 232.

Moreover, the Court has upheld a union's decisions to limit these exact issues to union members under parallel provisions in the NLRA. For example, in *NLRB v. Financial Inst. Employees,* 475 U.S. 192, 106 S.Ct. 1007, 89 L.Ed.2d 151 (1986), the National Labor Relations Board ("NLRB") had required the union to permit nonmember employees to vote on the union's decision to affiliate. On appeal, the NLRB did not even argue that all employees must be allowed to participate in the affiliation process; it argued only that requiring that all employees vote was a reasonable way to protect the right to select a bargaining representative. The Supreme Court rejected even the NLRB's narrow argument. The Court explained that, in the absence of the issue of whether a majority of the employees continued to support the affiliated union, the NLRB "violated the policy Congress incorporated into the Act against outside interference in union decisionmaking." *Id.* at 204, 106 S.Ct. at 1014. The Court continued by observing that the effect on representation was no different from the "many decisions" made by the union that " 'affect' its representation of nonmember employees." *Id.* at 205, 106 S.Ct. at 233. The Court explained, "It may decide to call a strike, ratify a collective-bargaining agreement, or select union officers and bargaining representatives." *Id.* at 205, 106 S.Ct. at 233. We pause to emphasize that Kidwell has claimed a right to participate in those same issues. The Court concluded,

> [T]he Act allows union members to control the shape and direction of their organization, and "[n]on-union employees have no voice in the affairs of the union." We repeat, dissatisfaction with the decisions union members make may be tested by a Board-conducted representation election only if it is unclear whether the reorganized union retains majority support.

*Id.* at 205–06, 106 S.Ct. at 233 (citation omitted).

Kidwell's claim depends on an employee's right to participate in all aspects of all decisions related to conditions of employment. As discussed above, however, the rights accorded an individual employee under the RLA are not so infinite. The employee, regardless of union membership, has the right to vote on the collective bargaining representative. The employee, regardless of union membership, has the right to be represented fairly and heard by the collective bargaining representative. But, if the majority of all employees should choose a union as representative, the employee does not have the right to participate in each and every aspect of the union's internal actions in carrying out its duties as representative.

Therefore, at least so far as the RLA is concerned, the union can offer every employee two choices: (1) union membership, and with it, if the union is elected collective bargaining representative, a right to vote on the internal delegation of collective bargaining power, the ratification of the negotiated agreement, and any political or other cause in which the union by majority vote decides to participate but with the responsibility for paying complete dues or (2) a nonmembership with the right to vote on whether the union should be the collective bargaining representative and responsible, if the union is so elected, for paying only the portion of the dues related to collective bargaining activities. The union's refusal to allow objections by members does not violate the RLA.

C. *The First Amendment and the Right to Object*

Kidwell argues, however, that, even if the RLA does not contain a right to object for union members, the First Amendment mandates such an option. We do not believe that the First Amendment contains any right that can be extended to cover Kidwell's proposition. Moreover, we believe that adopting Kidwell's proposition could infringe on the union's First Amendment right of expressive association. It would cause to rise, in another guise, the free rider situation by permitting union members to avoid paying a fair share of political activity expenses incurred by an organization which they had voluntarily joined.

To raise the First Amendment argument, the union's actions must constitute state action. We are inclined to believe, however, that no state action exists outside of the narrow area of those actions taken by the union as the collective bargaining representative.

The state action prerequisite " 'preserves an area of individual freedom,' " and permits "citizens to structure their private relations as they choose subject only to the constraints of statutory or decisional law." *Edmonson v. Leesville Concrete Co., Inc.,* — U.S. —, 111 S.Ct. 2077, 2082, 114 L.Ed.2d 660 (1991) (citation omitted). State action has been found where the deprivation of constitutional rights has been caused by "the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible," *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982), and where "the private party charged with the deprivation could be described in all fairness as a state actor." *Edmonson,* 111 S.Ct. at 2083. The issue of state action focuses upon whether the government can be held responsible for the private party's actions. Of late, the Supreme Court has indicated that such responsibility rarely arises unless the government " 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must be deemed to be that of the [government].' " *San Francisco Arts & Athletics v. U.S. Olympic Comm.,* 483 U.S. 522, 546, 107 S.Ct. 2971, 2986, 97 L.Ed.2d 427 (1987) (citation omitted).

Although the Court construes § 8(a)(3) of the NLRA and § 2, Eleventh of the RLA as "in all material respects identical" and as " 'statutory equivalent[s],' " *Beck,* 487 U.S. at 745–46, 108 S.Ct. at 2648–49, the state action area is more confused. Section 2,

Eleventh "pre-empts state laws that would otherwise ban union shops." *Beck*, 487 U.S. at 746 n. 3, 108 S.Ct. at 2649 n. 3; *see id.* at 761, 108 S.Ct. at 2656. The NLRA does not; rather, it "expressly preserves the authority of States to outlaw union-security agreements." *Id.* at 761, 108 S.Ct. at 2656. The RLA's preemption became the basis for a finding of state action. In *Railway Employees' Dep't v. Hanson*, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956), the Court stated that, if "private rights are being invaded, it is by force of an agreement made pursuant to federal law which expressly declares that state law is superseded." *Id.* at 232, 76 S.Ct. at 718. Although recognizing that "it takes a private agreement to invoke the federal sanction," the Court held that the "enactment of the federal statute authorizing union shop agreements is the governmental action on which the Constitution operates...." *Id.* The Court has explained the *Hanson* decision as providing that "the negotiation and enforcement of such [union security] provisions in railroad industry contracts involve[] 'governmental action' and is therefore subject to constitutional limitations." *Beck*, 487 U.S. at 761, 108 S.Ct. at 2656.

The trend under the NLRA, however, has been to find no state action. In *Beck*, the Court declined to "decide whether the exercise of rights permitted, though not compelled, by § 8(a)(3) involves state action." *Id.* The Court went on to cite two Supreme Court cases in which union decisions had been found not to involve state action. *United Steelworkers v. Sadlowski*, 457 U.S. 102, 102 S.Ct. 2339, 72 L.Ed.2d 707 (1982), involved the union's internal rule that only members could contribute to union election funds and a challenge to it under a federal statute. In a footnote, the Court stated that the First Amendment rights of free speech and association were irrelevant because "the union's decision to adopt an outsider rule does not involve state action." *Id.* at 121 n. 16, 102 S.Ct. at 2350 n. 16. In *United Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), the Court concluded that the union's negotiation of the affirma-

tive action plan did not involve state action. *Id.* at 200, 99 S.Ct. at 2725. In the *en banc* opinion in *Beck*, the Fourth Circuit also declined to address the state action issue although at least five members of the Court believed that no constitutional basis for relief existed. *See Beck*, 800 F.2d 1280, 1290 (4th Cir.1986) (*en banc*) (concurring opinion). Other circuits, however, have found no state action under the NLRA. *See, e.g., Price v. International Union, United Auto. Aerospace & Agric. Implement Workers*, 927 F.2d 88, 91–92 (2d Cir. 1991), *petition for cert. filed* (June 3, 1991) (No. 90–1855); *Kolinske v. Lubbers*, 712 F.2d 471, 474–80 (D.C.Cir.1983); *Hovan v. Carpenters*, 704 F.2d 641, 642–45 (1st Cir. 1983).

In light of a growing reluctance to find state action under the NLRA, we examine the scope of state action present under the RLA. The coercive effect of the RLA over nonmember employees and its preemption of state law often give rise to state action. *See Hanson*, 351 U.S. at 232, 76 S.Ct. at 718. But often does not necessarily mean always. Many decisions by a union that has been elected collective bargaining representative, for example, support of a local political candidate or the design for the union's softball team uniforms, can hardly be considered state action. The mere fact of regulation of some aspects of the union's duties under the RLA does not give rise to state action. *See West v. Atkins*, 487 U.S. 42, 52 n. 10, 108 S.Ct. 2250, 2257 n. 10, 101 L.Ed.2d 40 (1988); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974).

But what of areas in which the union has adopted internal rules to carry out its governmental authority? The RLA does not specifically authorize or require such rules. The RLA only addresses the conduct of the actual collective bargaining representative and addresses the representative almost as if it were a single person. It does not address how an entity chosen as representative should arrange its decisionmaking process so that it acts as a single person. Moreover, the RLA does not specify membership criteria for the collective bargain-

ing representative. The union actions challenged by Kidwell involve those internal union matters. If the government is not responsible for the termination decisions of heavily regulated utilities with electricity monopolies, *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), the decision to transfer or discharge Medicaid patients by extensively regulated and federally subsidized nursing homes, *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), the decision to discharge employees by extensively regulated private schools serving a mandatory public function with almost complete public funding, *Rendell–Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), the enforcement of the federally granted right to prohibit uses of "Olympic" by the federally chartered United States Olympic Committee which represents the United States government's interests in international amateur sports, *see San Francisco Arts & Athletics*, 483 U.S. 522, 107 S.Ct. 2971, and the findings of the NCAA that a state university's basketball coach violated NCAA rules which resulted in that coach's suspension, *see National Collegiate Athletic Assoc. v. Tarkanian*, 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988), we do not believe that state action would exist over the internal membership and procedural decisions of a union chosen collective bargaining representative under the RLA. Moreover, although we make no attempt to condone the membership exclusion practiced by the union in *Steele*, the Court did distinguish between the duties of the union elected collective bargaining representative under the RLA and that union's "right to determine eligibility to its membership." *Steele*, 323 U.S. at 204, 65 S.Ct. at 233; *see Hovan*, 704 F.2d at 644–45. The union's decision in the present case over the requirements for membership, although having an impact on those who may participate in the union's duties in carrying out its role as collective bargaining representative, does not constitute state action.

■ However, even assuming state action existed, we do not believe that the choice offered to Kidwell violates any First Amendment rights. Kidwell bases her argument on the First Amendment but the precise origin and content of her claimed rights are not clear. Kidwell appears to allege a First Amendment right to associate with a group that makes decisions relating to her employment along with a First Amendment right not to pay for the political and ideological activities of the group. We perceive no First Amendment right to object to certain expenditures where membership is not required as an actual or *de facto* condition of employment. We cannot find any precedent for a right just to associate with any group without regard to the group's requirements. And, we have severe reservations about impinging on the union's First Amendment right to expressive association.

We agree with Kidwell that cases have found a First Amendment right not to pay for political and ideological costs of an association to which one is a member. In every case, however, membership was either actually compelled or in essence was required to retain employment. In *Abood*, the plaintiffs argued that their First Amendment right arose because they had been prohibited from "refusing to associate." 431 U.S. at 234, 97 S.Ct. at 1799.[12] The Court wrote that the First Amendment principles,

> that in a free society one's beliefs should be shaped by his mind and conscience rather than coerced by the State ... prohibit a State from compelling any individual to affirm his belief in God or to associate with any political party *as a condition of retaining public employment.* They are no less applicable to the case at bar, and they thus prohibit the appellees from requiring any of the appellants to contribute to the support of an ideological cause he may oppose as *a condition of holding a job as a public school teacher.*

---

**12.** Recall that in *Abood*, the Michigan courts had construed a Michigan statute to require union member and nonmember employees to pay equal dues, with no objection right, as *a condition of employment.*

*Id.* at 235, 97 S.Ct. at 1799 (emphasis added) (citations omitted). The *Abood* Court thus based its reasoning on the idea that a contribution required to keep a job had to be narrowly construed. The *Abood* Court went on to explain:

> We do not hold that a union cannot constitutionally spend funds for the expression of political views, on behalf of political candidates, or toward the advancement of other ideological causes not germane to its duties as collectivebargaining representative. Rather, the Constitution requires only that such expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas *and who are not coerced into doing so against their will by the threat of loss of governmental employment.*

*Id.* at 235–36, 97 S.Ct. at 1800 (emphasis added).

In *Keller v. State Bar of California,* —— U.S. ——, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990), the Court addressed whether an attorney's *mandatory* contributions to the California State Bar could be used for political and ideological activities. All attorneys practicing in California had to be members of the State Bar. *Id.*, 110 S.Ct. at 2235. The State Bar, however, used the funds from the compelled membership to lobby and engage in other political or ideological causes. Under the State Bar system, no one could be a nonmember of the State Bar and only pay for the minimum costs of bar-related activities. A unanimous Court concluded that an attorney could be asked to contribute to an organization that espoused views of the majority but with which the individual disagreed. *Id.* However, the Court held that the State Bar could not use the mandatory compelled dues of objecting lawyers to fund political and ideological activities. *Id.* at 2236.

In both cases, a person's right to engage in employment triggered the First Amendment right to object: in *Abood,* employees had to pay full union dues, albeit as an agency fee, to keep their jobs; in *Keller,* attorneys had to pay full dues to the Bar to practice in California. The Court's decisions recognize that the cost of engaging in employment regulated by an association cannot automatically include amounts that will go to political or ideological activities of the association. To keep a job, one cannot be forced to contribute to the majority's political desires. Kidwell faces no such quandary. She may keep her job by paying only the minimum nonpolitical and nonideological component of the union's dues. If she chooses to join the union, she is no longer an involuntary contributor and may be bound by the will of the majority. Put simply, the political activities which a majority wishes to engage in will probably result in expenses. They are very like the lunch which is never free. Choosing voluntarily to join the union, a member must meet her or his share of the expenses.

The discussion in *Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), does not compel a different result. In *Austin,* the Court upheld a Michigan law prohibiting corporations from using their treasuries directly to support or oppose state political candidates, despite the argument that the statute was underinclusive because it excluded labor unions. The Court distinguished "labor unions" from "corporations." The Court explained that "union members who disagree with a union's political activities need not give up full membership in the organization to avoid supporting its political activities." *Id.,* 110 S.Ct. at 1400. Although standing alone, the language perhaps appears to support Kidwell's argument, the paragraph continued:

> Although a union and an employer may require that all bargaining unit employees become union members, a union may not compel those employees to support financially "union activities beyond those germane to collective bargaining, contract administration, and grievance adjustment." ... An employee who objects to a union's political activities thus can decline to contribute to those activities, *while continuing to enjoy the benefits derived from the union's performance of its duties as the exclusive representative of the bargaining unit on labor-management issues.*

*Id.* at 1401 (emphasis added) (*quoting Beck,* 487 U.S. at 745, 108 S.Ct. at 2648). Thus, read in context, the Court's statement that an employee was not required to "give up full membership," referred to union shops and membership in the limited sense that all employees receive the benefits obtained by the union regardless of financial support for the union's political activities. A corporate shareholder, employee, or customer cannot obtain the nonpolitical and nonideological benefits of involvement with the corporation without perhaps unwillingly contributing to political or ideological activities. *Id.,* 110 S.Ct. at 1398–99. Under the RLA, however, an employee will always be assured of the benefit of the nonpolitical and nonideological collective bargaining activities of the union without regard for union membership.[13] *Austin* does not support a member's right to object.[14]

We agree with the *Austin* Court that disincentives less extreme than loss of employment may trigger the right to object. 110 S.Ct. at 1399. The disincentives for Kidwell if she is not a union member, however, are not extreme. She can vote on the collective bargaining representative. She will always be fairly represented by that representative. And she can form a rival group for the noncollective bargaining activities. That membership does have some privileges is not enough to raise a First Amendment right to object.

In the absence of a right to object as a member, Kidwell claims a right to associate with the union on her own terms, *i.e.,* refusing to contribute to activities unrelated to collective bargaining. The union, however, claims a right to associate with people who are interested in contributing to those noncollective bargaining related activities.

The Court has stated that, although "the First Amendment does not in terms protect a 'right of association,' our cases have recognized that it embraces such a right in certain circumstances." *Dallas v. Stanglin,* 490 U.S. 19, 23–24, 109 S.Ct. 1591, 1594, 104 L.Ed.2d 18 (1989). Two "senses" of freedom of association have been recognized. The first, inapplicable to either the union or Kidwell, is a right " 'to enter into and maintain certain intimate human relationships.' " *Id.* at 24, 109 S.Ct. at 1594 (*quoting Roberts v. United States Jaycees,* 468 U.S. 609, 617, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462 (1984)). The second is " 'a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion.' " *Id.* A union appears to be an archetype of an expressive association. *See Board of Directors of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 548–49, 107 S.Ct. 1940, 1947, 95 L.Ed.2d 474 (1987); *see also Conti v. City of Fremont,* 919 F.2d 1385, 1388–89 (9th Cir.1990) (no First Amendment associational right of entertainment owner to do business with 18–20 year olds); *Watson v. Fraternal Order of Eagles,* 915 F.2d 235, 243–44 (6th Cir.1990) (private drinking club had no First Amendment protection).

The Court has examined rights of association not by looking at whether the person has a right to be included, but rather whether the association has a right to exclude:

> There can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire. Such a regulation may impair the ability of the original members to express only those views

**13.** We note that the dissenting Justices—Justices Scalia, Kennedy, and O'Connor—felt that, even in a corporation, "the disincentives to disassociate are not comparable.... One need not become a member of the Michigan Chamber of Commerce or the Sierra Club in order to earn a living. To the extent that members disagree with a nonprofit corporation's policies, they can seek change from within, withhold financial support, cease to associate with the group, or form a rival group of their own." 110 S.Ct. at 1424 (Kennedy, J., dissenting).

**14.** The citation to *Beck* supports this conclusion. Moreover, the Court described *Abood* as "holding that compelling *nonmember* employees to contribute to union's political activities infringes employees' First Amendment rights." 110 S.Ct. at 1400 (emphasis added).

that brought them together. Freedom of association therefore plainly presupposes a freedom not to associate.

*Roberts v. United States Jaycees,* 468 U.S. 609, 623, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984). Eradicating discrimination provides a sufficiently compelling state interest that courts or states may force associations to accept members if such compulsion is the least restrictive means available. *Id.*

Kidwell's desire for membership at the reduced price has little constitutional compulsion. For example, in *Minnesota Bd. of Community Colleges v. Knight,* 465 U.S. 271, 104 S.Ct. 1058, 79 L.Ed.2d 299 (1984), the Court held that the rights of nonunion teachers at a community college were not violated by an exclusive state statutory right of the union to meet and confer on nonmandatory subjects with the state. The Court recognized that the nonunion teachers would feel pressure to join the union; however, the Court stated that "the pressure is no different from the pressure to join a majority party that persons in the minority always feel. Such pressure is inherent in our system of government; it does not create an unconstitutional inhibition on associational freedom." *Id.* at 290, 104 S.Ct. at 1069.[15]

Indeed, the Court has upheld the right of an association to choose its members in an even more compelling situation. In *Democratic Party v. Wisconsin,* 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981), the Court rejected the idea that voters who desired to affirm Democratic party membership in secret (*i.e.,* instead of by open primary) in the presidential primary elections could compel the National Democratic Party to recognize their delegates. Wisconsin had a state statute that bound state Democratic delegates to vote according to results of an open primary. The Democrat-

ic National Party refused to seat the delegates. The Court upheld the right of the National Party " 'to identify the people who constitute the association, and to limit the association to those people only.' " *Id.* at 122, 101 S.Ct. at 1019 (citation omitted). The Court concluded that a "political party's choice among the various ways of determining the makeup of a State's delegation to the party's national convention is protected by the Constitution." *Id.* at 124, 101 S.Ct. at 1020.

Moreover, in a society where many people are money conscious, in other words, known to free ride, an association could find itself practically bankrupt and powerless if it had to permit all members to opt out of payments. Almost fifty years ago, the Court wrote, "One would have to be blind to history to assert that trade unionism did not enhance and strengthen the right to work." *Hanson,* 351 U.S. at 235, 76 S.Ct. at 719–20. In the absence of more compelling interests, for example, the eradication of race or sex discrimination, we refuse to compel the union to admit as members those who choose to pay only for collective bargaining activities.[16]

## III.

Kidwell and the other plaintiffs appeal from the district court's ruling regarding arbitrability and class certification.

### A. *Standard of Chargeability and Escrow Verification*

The plaintiffs argue that the district court judge erred in refraining from ruling on two of their claims: (1) the decision about categories of chargeable expenditures and (2) the absence of an auditor to determine and verify escrow amounts because the plaintiffs had not first resorted to the arbitration process. The plaintiffs

---

**15.** The present case is less problematic than the state statute in *Knight.* As Justices Brennan's and Stevens' dissents explained, the union context does not present concerns with academic freedom, *see* 465 U.S. at 296–97, 104 S.Ct. at 1072 (Brennan, J., dissenting), and the scope of exclusive representation by the union is confined, *id.* at 299–300, 104 S.Ct. at 1073–74 (Brennan, J., dissenting), *id.* at 301–304, 315–16, 104 S.Ct. at 1074–76, 1082 (Stevens, J., dissenting).

Moreover, the union as the collective bargaining representative has a statutory duty of fair representation. *See id.* at 318–20, 104 S.Ct. at 1083–84 (Stevens, J., dissenting).

**16.** Of course, we do not address whether the union may base membership on financial ability, rather than willingness, to pay.

contend that *Chicago Teachers Union v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), does not require exhaustion by arbitration. With respect to the actual claims, the plaintiffs first argue that the union's legal definition of chargeable expenditures is constitutionally overbroad. They allege (1) that the union uses a forced "cross-bargaining unit subsidization" concept rather than basing the charges on the actual bargaining unit, and (2) that the union includes most lobbying costs. Second, they claim that the union's failure to have a certified public accountant verify the escrow amount violates *Hudson.*

The union replies that the notice on its face is not overbroad. Furthermore, the union contends that the district court correctly understood that the plaintiffs' real concern was with the fee calculation. The union argues that it provided the plaintiffs with the opportunity to have arbitration and the plaintiffs declined, thus the district court correctly found the challenge to fee calculation barred. The union also contends that since 1985 it has more than complied with constitutionally required procedures by escrowing all of the contested reduced fee paid.

In *Hudson,* the Court held that the union must "provide for a reasonably prompt decision by an impartial decisionmaker." 475 U.S. at 307, 106 S.Ct. at 1076. The Court gave two possibilities: (1) a state could choose "to provide extraordinarily swift judicial review for these challenges," *id.* at 308 n. 20, 106 S.Ct. at 1076 n. 20; or (2) the union could provide "an expeditious arbitration." *Id.* at 308 n. 21, 106 S.Ct. at 1077 n. 21. The Court added that the "arbitrator's decision would not receive preclusive effect in any subsequent § 1983 action." *Id.*

■ Recent appellate courts have sought to decide whether and when plaintiffs must exhaust union arbitration procedures before appealing to a federal court. In *Tierney v. City of Toledo,* 917 F.2d 927, 940 (6th Cir.1990), the court concluded that, as a general matter, exhaustion was not necessary before constitutional claims were brought in federal court but did not ad-

dress the scope of "constitutional" claims. However, in *Hudson v. Chicago Teachers Union,* 922 F.2d 1306 (7th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2852, 115 L.Ed.2d 1020 (1991), the court stated that judicial review without prior arbitration was limited to ensuring that the proper procedure—fair share notice, an impartial decisionmaker to determine fee amount, and escrow protection—was followed. *Id.* at 1314. "[T]he singular role of the federal courts in reviewing the adequacy of fair share notice is to determine whether the notice gives the nonunion members enough information to challenge the basis for the fee." *Id.* It noted that, if the decision on fee calculation was adverse to the plaintiffs, they could seek review in the federal courts. *Id.* It refused to become involved in more specific determinations and micromanagement prior to arbitration. In *Dashiell,* the court did not address the exhaustion issue. Nevertheless, it seemed to be in accord with the Seventh Circuit by stating that the First Amendment

> requires only that the union disclose as part of its initial explanation to employees (1) such information that reveals to the employees major descriptive categories of expenses which will be assessed against the employees; (2) the component dollar amount of each category so chargeable; and (3) information to show that the financial figures have been verified by an independent auditor.

925 F.2d at 757.

We decline to decide the arbitration issue because even if the court had considered the claims, dismissal would have been proper. The notice of chargeable expenditures is not overbroad. It provides, "Objectors shall be charged for all activities germane to collective bargaining." The language parallels that in *Lehnert v. Ferris Faculty Ass'n,* —— U.S. ——, 111 S.Ct. 1950, 1957, 114 L.Ed.2d 572 (1991), and thus is permissible. Even the more specific standard found in Article 27 of the union's constitution, "All funds expended, directly or indirectly, on legislative activity not pertinent to the Union's role as bargaining representative," is not overbroad. *See* Art. 27 § 8(d)

(1986); Art. 27 § 3(d) (1988). Although in *Lehnert,* the Court held that the objectors to public sector unions could not be charged for "legislative lobbying or other political union activities outside the limited context of contract ratification or implementation," *id.,* 111 S.Ct. at 1961, the Court's rationale was that connection between the challenged lobbying activities and "the union's function as bargaining representative is too attenuated...." *Id.* at 1959–60. Thus, the Court based its decision on *which* activities would qualify as related to the *function of bargaining representative.* Although after *Lehnert* the union may find it difficult to apply the standard to many lobbying costs, the union's use of the identical phrase in its standard is not overbroad.[17] Furthermore, contrary to the plaintiffs' contention of the problems with cross-subsidization, *Lehnert* found that "a local bargaining representative may charge objecting employees for their pro rata share of the costs associated with otherwise chargeable activities of its state and national affiliates, even if those activities were not performed for the direct benefit of the objecting employees' bargaining unit." *Id.* at 1961. Thus, in this regard, the notice of chargeable activities also is not overbroad.

■ The plaintiffs further contend that the union violated *Hudson* by failing to have a certified public accountant verify the amount in escrow and certify that the only monies not in escrow were those that no objector could reasonably challenge. However, since 1985, the union has placed in escrow the entire amount of the reduced fee paid by an objector who seeks to challenge the amount. *Hudson* states, "If the Union chooses to escrow less than the entire amount, however, it must carefully justify the limited escrow on the basis of the independent audit, and the escrow figure must be independently verified." 475 U.S. at 310 n. 23, 106 S.Ct. at 1077 n. 23. Because the union has escrowed the entire

amount, these further requirements are inapplicable. The union, of course, should provide notice of its procedures in this regard; however, the absence of any such notice has not harmed the plaintiffs.

## B. *Class Certification*

■ The plaintiffs dispute the district court's denial of class certification to all objectors since 1985 and claim that they are suitable class representatives. The union responds by asserting that the plaintiffs only ultimately requested class certification as to their challenges to the union's filing requirements, no longer in effect. The union argues that no abuse of discretion occurred: (1) the claims were not typical because none of the plaintiffs' objections had been rejected for failure to comply with the filing requirements; (2) the filing requirement claims were moot prior to the resolution of the certification motion; (3) damages claims for moot issues must be brought under Fed.R.Civ.P. 23(b)(3); (4) class certification was not brought under 23(b)(3); and (5) even if it had been, certification would have constituted impermissible one-way intervention because the decision on the merits had already been rendered. The plaintiffs vigorously deny these allegations.

The district judge did certify a class of persons who can be represented by Kidwell in her position that union members should be allowed to object. However, the district judge denied a motion to amend the judgment to certify a larger class. The plaintiffs claimed that the suit was brought

> on behalf of themselves and all employees who have paid dues or fees pursuant to a [Union] collective bargaining agreement AND who advised [the Union] at any time since January 1, 1985, or will advise [the Union] in the future of their objection to the expenditure of a portion of dues or fees for political purposes or for any other purpose not part of the

---

**17.** The plaintiffs also argue that the current Audit Protocol demonstrates that the union includes most lobbying costs. Although the union might be well advised to change the Protocol to more closely parallel the *Lehnert* opinion, the

Protocol basically gives examples of expenses that the union believes might have a sufficient connection under the stated standard. We refuse to determine the legitimacy of hypothetical examples in the Audit Protocol.

statutory duties of an exclusive bargaining representative; or who requested or will request a rebate or reduction of dues or fees.

The district judge stated that the class projecting into the future was too indefinite and that "the named plaintiffs' factual circumstances are not representative, or even typical, of the circumstances of those whom they purport to represent." The judge also noted that some objecting employees, including all the plaintiffs, received a reduction, while others did not.

■ Admittedly, the trend is to give Rule 23 a liberal construction. *See In re A.H. Robins Co.*, 880 F.2d 709 (4th Cir. 1989). However, review of certification is under an abuse of discretion standard. *See Stott v. Haworth*, 916 F.2d 134, 139 (4th Cir.1990); *Zimmerman v. Bell*, 800 F.2d 386, 389 (4th Cir.1986). And we conclude that the district judge's ruling was not an abuse of discretion.

We find it unnecessary to address all of the plaintiffs' or the union's contentions because the plaintiffs have not met the "typicality" and "commonality" requirements of Rule 23. In this case, as in others, the commonality and typicality requirements merge. *See Stott*, 916 F.2d at 143. " 'Both serve as guideposts for determining whether … the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected….' " *Id.* (*quoting General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2370 n. 13, 72 L.Ed.2d 740 (1982)).

The plaintiffs have not suffered any injury, never mind an injury similar to that of those whom they seek to represent. The plaintiffs claim that they have suffered "the injury of having monies taken from them, over their objections, in the absence of the procedural safeguards required by *Hudson*" and that the same injury accrues to all objectors. However, the district judge found that "the plaintiffs suffered no actual injury as a result of the invalid practices, which have since been eliminated." The judge denied the plaintiffs even

the nominal damages of $1.00 for a denial of due process. The plaintiffs have not appealed that ruling.

The plaintiffs do not represent other objectors, some of whom also might have received a rebate, some of whom might not have, and some of whom might not even care to receive one. *See Adams v. Bethlehem Steel Corp.*, 736 F.2d 992, 994–95 (4th Cir.1984) (holding that the typicality and commonality requirements were not met merely by showing the "existence" of a wrong without an identifiable injury). The Seventh Circuit has cogently explained the dangers of class certification in a remarkably similar context:

> The district judge was right not to certify the suit as a class action on behalf of the 10,000 nonunion members. A potentially serious conflict of interest within the class precluded the named plaintiffs from representing the entire class adequately…. Two distinct types of employees will decline to join the union representing their bargaining unit. The first is the employee who is hostile to unions on political or ideological grounds. The second is the employee who is happy to be represented by a union but won't pay any more for that representation than he is forced to. The two types have potentially divergent aims. The first wants to weaken and if possible destroy the union; the second, a free rider, wants merely to shift as much of the cost of representation as possible to other workers, i.e., union members. The "restitution" remedy sought by the National Right to Work Legal Defense Foundation, which represents the nine named plaintiffs, is consistent with—and only with—the aims of the first type of employee.

*Gilpin v. AFSCME, AFL–CIO*, 875 F.2d 1310, 1313 (7th Cir.), *cert. denied*, 493 U.S. 917, 110 S.Ct. 278, 107 L.Ed.2d 258 (1989). The court upheld the district court's denial of class certification adding that the "National Right to Work Foundation is not an adequate litigation representative" for those "nonunion employees who, while not wanting to pay more (and perhaps even

**306**

wanting to pay less) than their 'fair share' fees, have no desire to ruin the union or impair its ability to represent them effectively...." *Id.*

We agree with the Seventh Circuit. The plaintiffs, once again represented by the National Right to Work Legal Defense Foundation, are not adequate representatives under Rule 23. The district court did not abuse his discretion.

The judgment is REVERSED as to whether a union member can object to paying the portion of union dues attributable to noncollective bargaining activities, and otherwise AFFIRMED.

REVERSED IN PART AND AFFIRMED IN PART.